CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
NOV 03 2009
JOHN F. CORCORAN, CLERK
BY: DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| DEBORAH K. BARTLEY, | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 5:08cv089 |
| v. | ) |
| MICHAEL J. ASTRUE, | ) By: Hon. Michael F. Urbanski |
| Commissioner of Social Security, | ) United States Magistrate Judge |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Plaintiff Deborah K. Bartley ("Bartley") brought this action for review of the Commissioner of Social Security's ("Commissioner") decision denying her claim for disability insurance benefits and supplemental security income benefits under the Social Security Act (the "Act") for the period of December 29, 2003 to July 18, 2005.[1] On appeal, Bartley argues that the Commissioner erred by failing to consider the cumulative effect of her impairments and by finding that Bartley did not meet Listing § 4.04B. After carefully reviewing the record, the undersigned finds that the ALJ's decision is not supported by substantial evidence and **RECOMMENDS** that the Commissioner's decision be **REVERSED** and **REMANDED** for the calculation of disability benefits starting from December 29, 2003.

I.

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Social Security Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Under the Social Security Act, [a reviewing court] must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached

---

[1] The Commissioner found Bartley disabled as of July 18, 2005. Therefore, this appeal concerns the closed period prior to that date.

through application of the correct legal standard." Id. (alteration in original) (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). "Although we review the [Commissioner's] factual findings only to establish that they are supported by substantial evidence, we also must assure that his ultimate conclusions are legally correct." Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980).

The court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The "[d]etermination of eligibility for social security benefits involves a five-step inquiry." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). This inquiry asks whether the claimant (1) is working; (2) has a severe impairment; (3) has an

impairment that meets or equals the requirements of a listed impairment; (4) can return to his or her past relevant work; and if not, whether he or she (5) can perform other work. Heckler v. Campbell, 461 U.S. 458, 460-62 (1983); Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (citing 20 C.F.R. § 404.1520). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Once the claimant has established a prima facie case for disability, the burden then shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"),[1] considering the claimant's age, education, work experience, and impairments, to perform alternative work that exists in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## II.

Bartley was born in 1958 (Administrative Record, hereinafter "R." 64), and at the time of the Administrative Law Judge's ("ALJ") decision was considered a "younger individual" under the Act. (R. 24.) 20 C.F.R. §§ 404.1563(b), 416.963(b). Bartley has an eighth grade education and worked as a housekeeper/custodian and laundry worker prior to her alleged onset date. (R. 87, 82.) Thus, the ALJ found her to have a "limited education" and described her past work experience as "unskilled." (R. 24.) Bartley alleges a disability onset date of Sept. 1, 2003 due to

---

[1] RFC is a measurement of the most a claimant can do despite his limitations. See 20 C.F.R. §§ 404.1545(a), 416.945(a). According to the Social Security Administration:

> RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

Social Security Regulation (SSR) 96-8p. RFC is to be determined by the ALJ only after he considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain). See 20 C.F.R. §§ 404.1529(a), 416.929(a).

3

severe cardiovascular impairment. (R. 81, 142.) Her application for benefits was rejected by the Commissioner both initially and again upon reconsideration. (R. 33, 45.) The ALJ held a hearing on March 3, 2006. (R. 14, 54.) In a decision dated July 28, 2006, the ALJ found that Bartley had coronary artery disease and peripheral vascular disease resulting in a cardiovascular impairment, the severity of which met the criteria of §4.04C of the listings as of July 18, 2005. See 20 C.F.R. pt. 404, Subpt. P, app. 1, § 4.04C. (R. 18, 22.) The ALJ, however, specifically declined to find that Bartley met the criteria for any listing prior to July 18, 2005. (R. 22.) Thus, the question presented in this appeal was whether the ALJ's decision denying benefits between 2003 and 2005 was supported by substantial evidence.

The ALJ found that Bartley had worked fulltime at a Substantial Gainful Activity ("SGA") from Sept. 1, 2003 until December 29, 2003 – thus making her ineligible to be considered disabled prior to December 29, 2003. (R. 17, 22.) For the period of December 29, 2003 to July 18, 2005, the ALJ concluded that Bartley possessed the RFC to perform a full range of unskilled, sedentary work on a sustained basis. (R. 22.) Specifically, the ALJ found that she could lift and carry no more than 10 pounds, occasionally lifting articles like files, ledgers, and small tools, while sitting at least six hours out of eight, and standing and/or walking at least two hours out of eight. (R. 22.) Although Bartley's impairments prevented her from performing her past relevant work, the ALJ found that there were a significant number of jobs in the national economy that she could perform. (R. 23.) Thus, the ALJ found Bartley not to be disabled under the Act for this time period. (R. 23.) The Appeals Council denied Bartley's request for review and this appeal followed. (R. 6.)

## III.

Bartley argues that the ALJ erred by incorrectly determining that Bartley did not meet the criteria of Listing § 4.04B during the December 29, 2003 to July 18, 2005 period. Bartley's argument relies on the characterization of three separate procedures that she underwent between October 13, 2003 and March 10, 2004 as ischemic episodes requiring revascularization. To meet the criteria for Listing § 4.04B, a claimant must suffer "[t]hree separate ischemic episodes, each requiring revascularization or not amenable to revascularization (see 4.00E9f), within a consecutive 12-month period (see 4.00A3e)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.04B.

### A. Medical History Relevant to Listing § 4.04B

On October 13, 2003, Bartley presented to the Augusta Medical Center with chest pain and pressure, absent foot pulses and a right femoral bruit, as well as a history of intermittent numbness of her left lower leg. (R. 149, 151, 232.) After a diagnostic catheterization that revealed a 70% right coronary artery lesion, she was transferred to the University of Virginia ("UVA") Hospital for a percutaneous transluminal coronary intervention procedure. (R. 149, 151.) In this procedure, two stents were placed in her right coronary artery. (R. 199.) The ALJ accurately described and fully considered this procedure in his opinion. (R. 18.)

On November 13, 2003 Bartley was readmitted to UVA Hospital with chest pain, shortness of breath, and numbness extending to her left arm, jaw and face. (R. 199.) A cardiac catheterization revealed, proximate to the previous stents, stenosis of approximately 80% in the right coronary artery. (R. 199.) Bartley received a third stent in the right coronary artery to alleviate this condition. (R. 199.) The ALJ accurately described and fully considered the additional stent that was implanted in November 2003. (R. 18, 19.)

During the procedure on November 13, 2003, Bartley was determined to have poor arterial access via her right femoral artery, as well as absent pulses below the femorals and a history of claudication.[2] (R. 199, 631.) Due to the reported pain in her legs, claudication, and poor femoral access, Bartley was later evaluated by Dr. Charles Goff for lower extremity arterial occlusive disease. (R. 201.) Leg pain was also noted in a follow-up visit for the November 13, 2003 procedure that Bartley made to Dr. Binder on December 1, 2003, when he noted that her "physical capabilities are totally limited by claudication." (R. 630.) Dr. Goff discussed with Bartley the possibility of an intervention for the lower extremity perfusion that he detected, noting her desire to have any such procedure performed at UVA Hospital. (R. 201.) On January 23, 2004, Bartley was evaluated by Dr. Harthun, a vascular surgeon, for complaints of bilateral leg pain, severe limitations on exercise, and faint to absent femoral pulses. (R. 614.) Dr. Harthun concluded that the symptoms of claudication and rest pain, as well as the results of additional non-invasive studies, were all consistent with a diagnosis of bilateral aorto-iliac disease. (R. 614.)

Following complaints of chest pain approximately two weeks later, Bartley was evaluated again on February 10, 2004 and subjected to a walking adenosine sestamibi test [designed to test for ischemia/angina]. Although she complained both of chest and leg pain, the evaluating cardiologist determined that the patient had "no complaint of chest pain or ECG changes diagnostic of ischemia" but did not opine on the leg pain. (R. 580.) One week later Bartley was subjected to a multi-station, bilateral, lower extremity runoff to confirm the previous diagnosis of bilateral aorto-iliac disease. (R. 577.) Dr. Harthun concluded from the results of this test that Bartley had (1) moderate-to-severe atherosclerotic disease of the distal aorta and iliac arteries,

---

[2] Claudication refers to the cramping pains in the legs caused by poor circulation of blood to the arteries of the leg muscles.

6

(2) complete occlusion of the entire left iliac system and the right external iliac artery, and (3) severe disease of mostly occluded bilateral common femoral arteries. (R. 577.)

Following an angiogram on March 5, 2004, Dr. Harthun recommended an aorto-bifemoral bypass graft. (R. 235.) A radiologist's evaluation of the chest and heart performed on the same day revealed "mild pulmonary hyperinflation" but the "vascular structure suggests normal" and there were "no acute cardiopulmonary findings." (R. 575.) Thereafter, Bartley was admitted to UVA Hospital on March 9, 2004 for the aorto-bifemoral bypass graft. This procedure was performed by Dr. Harthun on March 9, 2004 and memorialized in an operative report that listed both the pre- and post-operative diagnoses as bilateral iliac arterial occlusive disease. (R. 236). The undersigned notes that the iliac artery is the artery that runs by the os ilium, the "expansive superior portion of the os coxae (hip bone)" to supply blood to the legs. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 907, 1328 (30th ed. 2003). The ALJ accurately described the relevant diagnoses and appropriately characterized this procedure.[3] (R. 19.)

### B. Requirements of Listing § 4.04B Were Not Met

As set forth above, the requirements of Listing §4.04B are "[t]hree separate ischemic episodes, each requiring revascularization or not amenable to revascularization (see 4.00E9f), within a consecutive 12-month period (see 4.00A3e)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.04B. The plaintiff asserts that the three procedures detailed above, the percutaneous transluminal coronary intervention of October 13, 2003, the stenting of November 13, 2003, and the aorto-bifemoral bypass graft of March 9, 2004, should suffice to meet Listing § 4.04B. The

---

[3] The Court does note that the ALJ was mistaken in claiming that "An echocardiogram during that hospitalization showed evidence consistent with moderate aortic stenosis; however, left ventricular function was normal with mild left ventricular hypertrophy and minimal aortic regurgitation." The exhibit cited for this claim relates to an echocardiogram for another patient, not Deborah Bartley. (R. 19, 299.)

ALJ considered all three of these procedures and concluded that the plaintiff did not meet Listing § 4.04B at any time. (R. 22.) Instead the ALJ found that the plaintiff met the requirements of Listing § 4.04C, and met these requirements only after July 18, 2005. (R. 22.) The ALJ did not specifically characterize the October and November procedures as ischemic revascularizations, but from his description it seems clear that they were understood as such. Thus, for the ALJ to have concluded that the plaintiff did not meet Listing § 4.04B, the ALJ must have concluded that the March 9, 2004 aorto-bifemoral bypass graft was not an ischemic episode requiring revascularization. The undersigned believes that the ALJ characterized the aorto-bifemoral bypass graft of March 9 not as an ischemic revascularization, but as one prompted by peripheral vascular disease, and, therefore, outside the requirements of Listing § 4.04B. The undersigned concurs with the ALJ and finds that there is substantial evidence to support his factual findings.

Although bilateral iliac arterial occlusive disease is similar to coronary artery disease ("CAD") in certain aspects, e.g., both are susceptible to treatment through stenting and both involve disruptions of the cardiovascular system, they should not be considered the same disease. Bilateral iliac arterial occlusive disease cuts off blood supply through the iliac artery to the lower extremities. Thus, it should be characterized as a peripheral vascular disease ("PVD") and must be evaluated differently from heart disease, particularly ischemic heart disease. Compare 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00A(1)(b)(ii) with 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00A(1)(c). Consequently, even though both conditions are often treated with revascularization, the significance of a revascularization in an evaluation of the severity of each condition is distinct. This unequal significance of revascularizations for ischemic heart disease and peripheral vascular disease is denoted by their separate treatments in the listings. The listing requirement that plaintiff relies on is tailored specifically to ischemic heart disease. Listing

§ 4.04B specifies that "ischemic heart disease" can be demonstrated by "[t]hree separate ischemic episodes, each requiring revascularization or not amenable to revascularization, within a consecutive 12-month period." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.04B. By comparison, peripheral vascular disease is evaluated under different standards, and is shown by "appropriate medically accurate imaging...[or] intermittent claudication." See 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 4.12A to 4.12D. Nowhere is revascularization designated as an important diagnostic occurrence. See id. Because claimants who suffer from ischemic heart disease may oftentimes also suffer from PVD,[4] the guidelines for the evaluation of PVD anticipates the confusion over the characterization of revascularization in the listings. See id., at § 4.00G(9) (specifying that peripheral vascular disease is still evaluated under "listing 4.12 if you have had a peripheral graft"). The bypass graft of March 9, 2004, therefore, was not a revascularization required by an ischemic episode.

Plaintiff argues in the alternative that "the third ischemic episode...occurred at some point prior to the procedure on March 10, 2004...[and] based on the medical evidence, Bartley's condition met or equaled listing 4.04 by December 29, 2003." (Pl. Br. at 9.) But this argument is, on its face, incompatible with the plain language of the listing. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, at § 4.00E(9)(f)("In 4.04B, each of the three ischemic episodes must require revascularization or be not amenable to treatment"). Even if Bartley's reports of difficulty breathing and pain in her chest, (R. 201, 580, 625), were indicative of an ischemic episode within the period at issue, Bartley would still not meet Listing § 4.04B unless a revascularization was compelled by each ischemic episode. There is no evidence of any revascularization after November 13 and before December 29, 2003. The undersigned notes, moreover, that during the

---

[4] An important cause for both diseases is smoking, which, according to the medical records, Bartley struggles in her attempts to quit.

9

period of time prior to March 9, 2004 an evaluation of Bartley was performed that expressly ruled out ischemia. (R. 508) ("Clinical Question: Rule out inducible ischemia; Impression: ...patient had no complaint of chest pain or ECG changes diagnostic of ischemia...") Additionally, it is clear from the evidence that the precipitating diagnosis for the aorto-bifemoral bypass graft, the only revascularization performed after November 13, 2003, was not ischemic heart disease, but peripheral vascular disease. Indeed, the doctors maintained that Bartley was suffering from peripheral vascular disease both before and after her operation. (R. 236.) Thus, substantial evidence supports the ALJ's conclusion that Bartley did not meet the criteria for Listing § 4.04B.

Although the ALJ did not lay out this analysis as completely as the plaintiff may have preferred,[5] the ALJ specifically noted the three different procedures, and accurately characterized them. Accordingly, the Court believes that the ALJ was correct in concluding Listing § 4.04B was not met. (R. 24.) The court, however, need only find that there is substantial evidence to support the Commissioner's conclusion. See Laws, 368 F.2d at 642. The analysis laid out above reveals, at the least, substantial evidence that the Commissioner's conclusion that Listing § 4.04B was not met was reasonable.

### IV.

Bartley next claims that the ALJ also erred by failing to analyze the cumulative effects of her impairments, specifically the combination of PVD, CAD, peripheral neuropathy and cervical disc herniation. Bartley argues that the pain from these conditions has not been well controlled with medication, was not adequately considered by the ALJ, and was so severe that she was completely disabled. (Pl. Br. 11.) After reviewing the record, the undersigned agrees with

---

[5] The ALJ did not specify that, had Bartley required a third revascularization due to ischemic heart disease, she would have met the criteria of §4.04B; but he clearly reviewed evidence sufficient to make that determination.

10

Bartley that the combination of these impairments was so severe that she was disabled prior to July 18, 2005 and finds that the Commissioner's decision to the contrary is not supported by substantial evidence.

A claimant's subjective reports of pain must be seriously considered by the ALJ as a nonexertional impairment. Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995). When faced with conflicting evidence contained in the record, however, it is the duty of the ALJ to fact-find and to resolve any inconsistencies between a claimant's alleged symptoms and her ability to work. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Accordingly, the ALJ was not required to simply accept Bartley's testimony that she was disabled by pain; instead, the ALJ's obligation was to determine, by examining the objective medical record, whether her underlying impairments could reasonably be expected to produce the complained of pain and corresponding impact on her ability to work. Craig v. Chater, 76 F.3d 585, 592-94 (4th Cir. 1996). A claimant's subjective testimony, however, when "supported by medical evidence that confirms the severity of the alleged pain arising from that condition is itself sufficient to support a finding of disability." Foote, 67 F.3d at 1561. See also Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).

Although it is the duty of the ALJ to resolve inconsistencies and evaluate conflicting evidence, the ALJ's discretion is not without limits. Even when objective medical evidence is lacking, the ALJ's discretion is limited because an ALJ may not simply discredit completely those of claimant's complaints that are unsupported by objective evidence, but must instead provide "specific cogent reasons for the disbelief" and "identify[y] what testimony is not credible and what evidence undermines the claimant's complaints." Lester v. Chater, 81 F.3d 821, 834 (1995). Beyond the constraints imposed by close consideration of the objective medical evidence, the ALJ's discretion is further circumscribed by his obligation to consider the

opinions of medical professionals. These opinions must be given weight "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527 (2005)). In following this list courts must necessarily, "accord greater weight to the testimony of a treating physician because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." Id. at 654 (internal quotations omitted). This is known as the treating physician rule.

Preliminarily, Bartley asserted that she was disabled starting from September 1, 2003. (R. 74, 101.) Bartley, however, continued to work until December 29, 2003 at a full-time position, with almost no changes to her performance. (R. 101, 109). Hence, even from her reported onset date, the ALJ had substantial evidence that Bartley was not, in fact, disabled. The undersigned concurs with this conclusion. On December 29, 2003, Bartley ceased to work at her then current position at the behest of her doctor. (R. 109.) Although the ALJ did not disagree with Bartley's claim or the doctor's opinion that she could not continue to work at the same position after December 29, 2003, the ALJ did insist that Bartley might have continued with a lighter regimen of sedentary work. Thus, the issue at hand is whether the ALJ's conclusion that Bartley's residual functional capacity ("RFC") after December 29, 2003 permitted her to perform sedentary work is supported by substantial evidence. The undersigned finds that the ALJ failed to appropriately consider the plaintiff's reports of non-exertional impairments, did not identify sufficient evidence to undermine the claimant's complaints of pain, and, most importantly, did

not adequately follow the treating physician rule. Thus, the ALJ's conclusion that Bartley was not disabled until July 18, 2005 is not supported by substantial evidence.

### A. The ALJ Failed to Appropriately Consider the Non-exertional Impairments

Although the ALJ appears to have been aware of the non-exertional impairments suffered by the plaintiff, his decision to disregard the import of these impairments is not supported by substantial evidence. The ALJ discussed the neuropathic pain she suffered in her extremities several times. (R.19.) ("Claimant estimated she could walk only 200 to 250 feet and that she experiences bilateral buttock, hip, thigh and calf pain with walking"); (R. 19.) ("the ache from her legs wakes her at night and is relieved by hanging her feet over the side of the bed"); (R. 20.) ("on January 4, 2005, she complained of continued leg pain…consistent with neuropathic pain involving both lower extremities"); (R. 20.) ("on June 7, 2005…there were findings suggestive of a possible early mild sensory peripheral neuropathy; however, definitive diagnostic criteria were not met"); (R. 20.) ("on June 16, 2005, she…started on Elavil for likely neuropathic pain"). But even the ALJ's relatively comprehensive consideration of her lower extremity pain neglected to include many other reports of pain by Bartley made to her doctors. (R. 559.) ("she is still complaining of burning pain, most notably in the right upper thigh…most likely neuropathic pain"); (R. 555.) ("she will have occasional sharp, shooting, pain and burning sensations…today she is an 8/10 and usually averages 8/10."); (R. 549.) ("continues to have pain in both legs which she describes as severe burning pain…description is classic of neuropathic pain").

Likewise, the ALJ reported, and apparently considered, pain stemming from Bartley's heart condition, and several problems with her back and neck. Though not as consistently reported as her leg and lower extremity pain, her back and neck pain make repeated appearances in the record. Some reports appear to be unrelated to serious disabling conditions. (R. 19.) ("on

13

May 5, 2004, she complained of pain in her cervical and thoracic spine since waking up after sleeping on the couch"); (R. 19.) ("she later complained of low back pain...on July 19, 2004...[and] was diagnosed with pyelonephritis"); (R. 19.) ("on August 2, 2004 she reported occasional bilateral low back pain...probably a urinary tract infection"). But other reports were so severe to have prompted MRIs and discussions of surgery. (R. 545-47.) (requesting MRI for investigation of cervical pain); (R. 541.) (Noting "impression: cervical spine stenosis" and describing pain as "burning and stinging...[with] parathesia and occasional numbness"); (R. 531.) ("her MRI showed a large C5-6 disc herniation...I think she will require surgical intervention").

Bartley's chest pain is, for the most part, consistently reported throughout the medical records, and highlighted by Dr. Binder's reports. It is certain that the chest pain up until July 18, 2005 was not disabling by itself, as after her stent placement in November 2003 her "episodes of angina...had only been occurring a couple of times a month." (R. 520.) Regardless, her chest pain was of such significance that Dr. Binder forbade her from returning to work. (R. 625.) ("she had been at work last week...and developed prolonged episodes of chest and jaw discomfort"). Dr. Binder continued to receive reports of chest pain, (R. 616), and similar impairments even after instructing Bartley to discontinue work. (R. 614.) ("She also complains of chronic left upper extremity weakness, which is not exacerbated by activity, and is not positional"); (R. 609.) ("Clinical Data: Chest Pain – Uncomplicated.") Her chest pain, although at times abating, still prompted a visit to Dr. Binder after her aortic femoral bypass operation. (R. 568.)

These acknowledged impairments appear to have been given no weight in the ALJ's findings. Instead, the ALJ found that "there were no additional exertional or non-exertional

14

limitations or restrictions of any significance." (R. 24.) This conclusion is not supported by substantial evidence. Pain itself can be disabling. Craig v. Chater, 76 F.3d 585, 592 (4th Cir. 1996). The record clearly demonstrates that Bartley suffered pain that was caused by objective medical conditions, the cornerstone of an analysis of pain. See Foster v. Heckler, 780 F.2d 1125, 1129 (4th Cir. 1986). Social Security regulations require the Commissioner to consider such reports of pain: "We will then determine the extent to which your…restrictions due to pain…can be reasonably be accepted as consistent with the medical signs and laboratory findings…to decide how your symptoms affect your ability to work." 20 C.F.R. §§ 416.929(a) & 404.1529(a). Because there is no substantial evidence to support the ALJ's conclusion that Bartley's RFC was not restricted by "non-exertional limitations or restrictions of any significance" (R. 24), it is **RECOMMENDED** that his decision be **REVERSED** and **REMANDED** for calculation of an appropriate award of benefits.

### B. The ALJ Did Not Identify Sufficient Evidence To Contradict Bartley

In discounting allegations of pain, the ALJ is required to provide "specific cogent reasons for the disbelief" as well as to "identif[y] what testimony is not credible and what evidence undermines the claimant's complaints." Lester, 81 F.3d at 834. Similarly, the ALJ is "required to make credibility determinations…about allegations of pain" and explain their evidence and conclusions because "the duty of explanation…is especially crucial in evaluating pain." Hatcher v. Sec'y of Health & Human Servs., 898 F.2d 21, 23 (4th Cir. 1989). The ALJ's decision does not meet this standard.

The ALJ appears to rely heavily the fact that the stents Bartley received in 2003 improved her condition. "Her coronary artery disease responded positively to angioplasty and stenting." (R. 22.) But the ALJ notes that she continued to report instances of chest pain that

required repeated use of nitroglycerin. (R. 22.) Moreover, the ALJ's eventual determination that she was disabled as of July 18, 2005 was prompted by frequent and increasing reports of chest pain, although this time these reports resulted in yet another stenting. (R. 519-22.) The mere fact that Bartley did not require another invasive procedure before July 18, 2005 does not mean that the effects of her ischemic heart disease were not sufficiently serious to preclude her from working before July 18, 2005.

With respect to her peripheral vascular disease, the ALJ appears to rely substantially on a report that her aorto-bi-femoral bypass surgery went relatively well, allowing the plaintiff to report being able to walk "4 to 5 blocks without symptoms, including leg discomfort." (R. 22.) But the ALJ seems to ignore all of the other repeated reports of leg pain that occurred after that operation. (R. 555.) ("She has improved blood flow to her legs...but she continues to have numbness and tingling...[and] occasional sharp, shooting, electrical pain and burning sensations"); (R. 545.) ("legs hurt all the time"); (R. 541.) ("At this time she complains of pain in her arms, legs, and neck. ...Impression: 1. Peripheral vascular disease with neuropathic pain"); (R. 529.) ("Patient reports pain in the bilateral lower extremities...burning and stinging like bumblebees...she notes subjective weakness in lower extremities and notes that they buckle out occasionally"). Her treating physicians considered the pain so severe that, given her failure to effectively manage her pain via medication (or tolerate the medications), they recommended on numerous occasions that she consider "the possibility of a spinal cord stimulator." (R. 530, 542, 549.) This severe pain, here supported by objective medical evidence, might well be considered to be disabling if uncontroverted. But when the ALJ cites only one contrary report about the effect of her operation on her impairments, he has not complied with his obligation to "identif[y]

what testimony is not credible and what evidence undermines the claimant's complaints." Lester, 81 F.3d at 834.

Finally, the reliance of the ALJ on her reported daily activities as "inconsistent with a complete inability to work," (R. 22), does not suffice to meet his obligations as outlined above. See Lester, 81 F.3d at 834. The ALJ does not identify specifically what aspects of her daily activities suggest that she is capable of sedentary work. To suggest that the minimal daily activities such as those performed by Bartley, e.g., cooking once per day, dusting once per week, shopping with assistance once every two weeks, reading the newspaper, talking on the phone, watching television, are somehow indicative of her ability to engage in work is clear error. See Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000); Thompson v. Sullivan, 987 F.2d 1482, 1490 (10th Cir. 1993). But even if the daily activities and scattered reports of successful operations were suggestive of small periods of claimant's improvement, the ALJ's conclusion would still be unsupported. Because the Commissioner must evaluate the claimant's "ability to work on a sustained basis," occasional symptom free periods are not inconsistent with disability. 20 C.F.R. § 404.1512(a). See also Leidler v. Sullivan, 885 F.2d 291, 292 n.3 (5th Cir. 1989); Poulin v. Bowen, 817 F.2d 865, 875 (D.C. Cir. 1987).

### C. The ALJ Failed to Appropriately Weigh Treating Physician's Opinion

The significance of Dr. Binder's recommendation that Bartley cease work on December 29, 2003 should not be overlooked. His later "Medical Source Statement" that provides his opinion that Bartley was effectively disabled as of January 2004 is equally important. (R. 742-747). As a treating physician, Dr. Binder's opinion must be accorded controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R.

17

§ 404.1527(d)(2). The primary reports that the ALJ relies to establish that Bartley's condition was improving were both authored by Dr. Binder: (1) "from a cardiac standpoint, she has been doing reasonably well with rare episodes of angina discomfort" (R. 630) and (2) "she is slowly improving with the ability to walk 4 to 5 blocks without chest pain, shortness of breath of [sic] leg discomfort." (R. 567.) But whereas Dr. Binder draws the conclusion that her impairments were affecting her significantly starting in January of 2004 (R. 747), the ALJ reaches the opposite conclusion. It is difficult to see how the ALJ can determine that Dr. Binder's overall opinion is "inconsistent with other substantial evidence in [the] case record" when the other substantial evidence also consists of opinions by Dr. Binder, which he presumably considered in forming his overall opinion.

Even were Dr. Binder's opinion not deemed controlling, it must be given appropriate weight under the standard of inquiry mandated by 20 C.F.R. § 404.1527 to evaluate and weigh medical opinions: "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527 (2005)). Dr. Binder is a cardiovascular specialist who has examined Bartley on multiple occasions in connection with her treatment, and his opinion is both supportable and consistent with the record. In fact, Dr. Binder specifically considered whether his "patient's impairments...[are] reasonably consistent with the symptoms and functional limitations described in this evaluation" and determined that they were. (R. 745.)

It is only in the "face of persuasive contrary evidence" that the ALJ should exercise his discretion to give less weight to a treating physician. See Mastro v. Apfel, 270 F.3d 171, 178

18

(4th Cir. 2001). As outlined above, the undersigned believes that there is no persuasive contrary evidence that would militate against accepting Dr. Binder's opinion as to the extent of Bartley's impairments. Accepting Dr. Binder's opinion as controlling or as strongly persuasive necessarily leads to the conclusion that Bartley was disabled from December 29, 2003 (effectively January 2004) when it is evaluated with the testimony of the vocational expert that the ALJ heard. (R. 876, 879.) Consequently, the undersigned concludes that the ALJ's decision to disregard Dr. Binder's opinion was not supported by substantial evidence.

## V.

At the end of the day, it is not the province of the court to make a disability determination. Rather, it is the court's role to determine whether the Commissioner's decision is supported by substantial evidence. In this case, while substantial evidence supports the ALJ's opinion as to Listing § 4.04B, it is absent for the ALJ's conclusion that Bartley was not disabled until July 18, 2005. Instead, the medical record and medical opinions support a finding that Bartley suffered from extensive pain attributable to objective medical conditions, which rendered her disabled during the closed period between December 29, 2003 and July 18, 2005. Accordingly, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and **REMANDED** for the calculation of an award of benefits from December 29, 2003 until July 18, 2005, plaintiff's motion for summary judgment be **GRANTED**, and the defendant's motion for summary judgment be **DENIED**.

The Clerk is directed to transmit the record in this case to Samuel G. Wilson, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within ten (10) days hereof. Any adjudication of

fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

**ENTER**: This 3rd day of November, 2009.

/s/ Michael F. Urbanski
Hon. Michael F. Urbanski
United States Magistrate Judge